23704, 236915, 2446, and 242203. And I understand that we have an agreement about how to proceed so that the United States will proceed, followed by counsel for Mr. Nordlicht. Is that Mr. Solomon? Yes, Your Honor. Followed by counsel for Ms. Small, Ms. Shevitz. Yes, Your Honor. And then the United States has reserved eight minutes for rebuttal? Yes, Your Honor. And then we have Mr. Nordlicht's counsel and Ms. Small's counsel have each reserved two minutes for rebuttal. Do I have it right? That's correct. Any objections? Okay, wonderful. So why don't we proceed. We'll hear from the Governor. Thank you, Your Honor. Good morning. May it please the Court. My name is Nick Axelrod. I'm an assistant United States attorney in the Eastern District of New York, and I also represented the government at Small's trial in 2022. Now, there are obviously a number of issues presented in these appeals, and I am happy to address them in whatever order the Court prefers. But if it is acceptable to the Court, I'd like to begin by addressing our cross-appeal, and then I can address any of the Court's questions about the defendant's appeals as well. The District Court erred when it granted a Rule 29 motion based on evidence that was not in the record. The District Court, in its decision, cited only documents from Small's trial that were not introduced at Nordlicht's. And that makes sense, because the District Court had rejected the very same arguments when they were raised by Nordlicht the year before, and the only difference in the record was Small's trial. The District Court reached that erroneous result only by misapplying Seminelli. The right to control was never a part of this case. It was not charged in the indictment. It's not contained in the jury instructions. That's correct. It's about money, it's about property in the form of contractual rights, and also a lien on the collateral itself. The scheme deprived the bondholders of traditional money or property interest, Your Honor, in three ways. First, and most fundamentally, as I said, it deprived them of money. It was clear from the record that there was not enough money to pay everyone back. And the effect of the consent solicitation was to ensure that the preferred equity got paid before the bondholders. So that's how it affected money. This fraud was accomplished by modifying the valuable contractual rights in the indenture, which didn't permit the money to be used to repay the preferred equity first. That's the second way. And third, the bondholders had a lien on the Renaissance proceeds. The indenture provided for a lien on all assets. That's Section 10.01 of the indenture. The Renaissance proceeds were collateral, and through the consent, that collateral was taken from the bondholders. The collateral was stripped from the company. That's the second way in which the district court erred. The district court further erred by misinterpreting the wire fraud statute to require an intent to cause economic loss. And if you look at the section of the district court's decision that we're addressing here today, it's actually captioned, intent to harm. The district court understood intent to harm to mean an intent to cause economic loss. But the Supreme Court has made clear, in the consensus decision from last year, that there is no requirement under the wire fraud statute that a defendant intend to cause economic loss. And this court has recognized the same recently in three decisions, in Runner, in Fishbein, and Gouldie. Runner is a published decision. Gouldie and Fishbein are summary affirmances. Do you mean to distinguish between economic loss and some other form of harm? Or are you suggesting that there is no requirement under the wire fraud statute, or presumably also under the bail fraud, now in the statutes, that the government prove any intent to harm anyone? I think the government has to prove an intent to wrong someone in their property rights. That's what McNally clearly holds. But wronging someone in their property rights and ultimately causing economic harm are two distinct concepts. Sure. So you can injure someone in their property rights, but hope that it will work out in the end, right? That's what this court has referred to. If the renaissance sale has reduced a larger sum of money, and Blackhawk wasn't facing the insolvency issues, or the difficulties it was facing on a day-to-day basis in paying its bills, and that the ultimate distribution of monies reached the bondholders because of the fact that the assets sold for higher alacrity, then your position is they still have a claim because they'd given up a contractual right prior to positioning it. They had a both common stock approach. Yes. I think all the elements of wire fraud would be satisfied. I think the difference here is in the facts of the consensus case itself. So the consensus case is a fraudulent inducement case. That's not our facts by any stretch. Here we're dealing with rights to be repaid. Here we're dealing with collateral. But take consensus. Consensus is a fraudulent inducement where nobody alleged that the Pennsylvania DOT didn't get what it paid for in an economic sense. The DOT got the services that it contracted for. Now, what it didn't get was a minority-owned business. They were wronged in their property rights because they didn't get what they wanted. They entered into a contract on false pretenses, Your Honor. But they didn't suffer what anyone could conceptualize as an economic injury, as a harm. Well, the court said there was a social value to what they were doing. It was part of a problem. Programmatic positioning with regard to simulating the growth of minority industries. And so, therefore, it had perhaps a long-range economic benefit. But the contractual right was sufficient enough. Contract rights are deemed property rights. And so, therefore, that fits the bill. I think that's correct. And I'm not aware of any decision that has found that an enforceable right under a contract does not satisfy the requirements to be considered property. Well, in fact, we've said the opposite. We've said that they do satisfy. So I'm agreeing with you. But more forcefully. Thank you, Your Honor. And, yeah, you can look back to the Supreme Court's decision in Carpenter to see why that is so. Because the Supreme Court's jurisprudence in this area has distinguished between mere information and valuable commercial entitlements that are property. So Carpenter articulates several factors and considerations. This is the case in which the Dow Jones was deprived of its exclusive right to news. And the court looked at that information and said this qualifies as property for a couple of reasons. To begin with, it's commercially valuable. It's exclusive. And it's enforceable under the law. And all of those factors are met in this case. The provisions of the indenture that are modified in the consent solicitation are the provisions that give meaning to the bond as a senior secured bond. The bondholders didn't just have a right to be repaid. The bondholders had a right to be repaid first. That's what it means to be senior. And the restricted payment covenant in the indenture is what gives that meaning. And that's one of the provisions that's modified in the consent solicitation. Oh, yeah. I mean, there are other rights they gave up, too. They gave up a right to lose the premium that they got if they cashed out right away and they ended up accepting the bond with CARP. So they lost, what, 6.875 percent? That's right. They lost more than that. That's the call premium. They also lost interest on a foregoing basis. And that goes to the district court's fourth error, which is the reweighing of the evidence. Why can't you value or why can't some expert value the right to be paid first, for example? It seems that maybe you have an argument that there was a form of economic loss. It was difficult to value it. It's a matter of just value evaluation. But I think your primary argument is we didn't have to prove economic loss. It was a form of harm. Is that right? I think it's sufficient to reverse that this is not an element of wire fraud. But the jury was instructed to find it, did find it, and we believed it. It proved to have value because, indeed, black elk was insolvent. So, therefore, there wasn't enough money in the Renaissance sale to go around. That's correct. And Dickson Yee testified that the bonds traded for, quote, pennies. I mean, that's the government, that's land that's been revisited. That's the whole reason for the bond indenture, the modification of the consent book. That's correct. The record showed that from January of 2014, Mr. Nordlich and the conspirators understood that this was a liquidation scenario, that there was not enough money to pay everyone back. His intent was to pay the preferred back at all costs because it could be, in his words, the end of the fund. And he was willing to risk the bondholders not getting paid back to do that. I think Your Honor is raising an additional issue that we have raised as well, which is the guidelines calculation. So, yeah, that's my next question. How do you square this with your argument with respect to the guidelines of the loss? So, our initial position has always been on the guidelines that there is a loss in this case. There is a harm in this case. It was found by the jury, and both bondholders who were called testified to losing money on the black elk bonds. The guidelines require that the loss be but-for, caused by a fraud, and that it also be reasonably foreseeable. And both of those aspects were satisfied here. You're talking about money lost from transactions on the market with regard to attempts to sell the bond? Yes, so Dickson Yee sold $3 million, which is all he could sell, out of his $3.5 million position over a period of several months after the fraud. He took a loss on those bonds. Did Judge Kogan remark that actually the price of the bonds increased shortly after the vote that solicitation was approved? There are a couple of problems with that, Your Honor, really two fundamental ones. The district court's event window was from the beginning of the consent solicitation to August 14th, when the consent solicitation closed. And Judge Kogan's understanding, his position, was that that meant all the information was in the market on August 14th. But that is not correct. Now, sitting here today, in hindsight, with access to all the internal emails, we understand that black elk was circling the drain, that the defendants were laying off 95% of its employees, and that a bankruptcy was a fait accompli. They were just putting it off for a year so there wouldn't be a fraudulent transfer. But there was no evidence that Dickson Yee knew any of that information on August 14th. That wasn't disclosed at all for years after. And that's why the guidelines say that if you're going to do an event study, an event window, you need to look at the date when the fraud is disclosed. That's in the guidelines. And the reason for that is because that is when the true information is provided to the market. Dickson Yee testified that he didn't know that the Renaissance proceeds had been used to, in fact, pay the preferred equity until Black Elk filed its next 10-Q in November. And in hindsight, it's obvious. But at the time, it wasn't. Because Dickson Yee had no reason to believe that Black Elk was being shut down and liquidated. And he did try to sell his bonds anyway. He suspected that this was a risk that could happen. And Yee testified that he sold as many of the bonds as he could, which brings us to the second error in this event study, which is a deep and liquid market. I apologize, Your Honor. A liquid market? The Black Elk bonds are not Apple bonds that are traded on some exchange where there's a ton of fixed-income analysts who are carefully monitoring the news. Both bondholders testified that this was in a liquid market. And in fact, the consent solicitation's risk factors address that the consent solicitation would make the market even less liquid. An event study makes sense where the efficient market hypothesis applies. But there was no evidence, and none cited by the district court, that this was the sort of liquid market where you could perform an accurate event study. And that was factored by the testimony. The other way you can think about the error on the guidelines is to think about traditional causation principles. The district court essentially said, you're a very sophisticated bondholder, to be sure. That's true. And you made a judgment that you wanted to run the risk and hold these bonds. Now, we've already discussed why that's a judgment based on imperfect information. But regardless, holding the bonds is not some unforeseeable intervening cause. Holding the bonds is the status quo. It's reasonably foreseeable to the defendants that the bondholders, who are entitled to a 13.75% coupon, are going to continue to hold their bonds. That was the whole reason they didn't want to give up their rights in the first place, because that's a great interest rate. That's over time. Yes. Yes, it is, Your Honor. And so the premise that the only reasonable thing for the bondholders to do on August 14th is fire sale their bonds has no support in the record. And the district court's reasoning also doesn't say anything in the record. Now, I do want to be clear, Your Honor. The guideline there, if the court reverses on the Rule 29 issues that we've presented as a matter of procedure, Mr. Nordlich needs to be resentenced de novo. So on that, as I understand it, the government at least made an argument with respect to gain as the appropriate form of calculating the guidelines. Is that correct? We did, Your Honor. That was a very, in our view, conservative way to think about this. And actually, I would like to address that. The risk the bondholders were exposed to, what is reasonably foreseeable, is that they will not be repaid. It's very simple. If you strip someone's collateral, what makes a bond secured, then you're increasing the risk that they won't be repaid, especially when you know the company is headed for a bankruptcy. I think under this court's precedence, in particular under Turk, the defendants could have been held accountable for whatever losses the bondholders had in the bankruptcy. Now, that would be practically difficult to figure out because information about beneficial owners is not public. So you would have to figure out all of the beneficial owners. Regardless, it was conservative of the government to say that's not the correct calculation. We're going to acknowledge, perhaps, that there could be some other factors at play. But I don't think we were required to because it's predictable that the market for oil would go down. So we didn't have to exclude that. It was a conservative choice to do so. And so we said it's too difficult to do, and you should look to gain instead. And the guidelines provisions that are in place today require that the gain, quote, results from the fraud. It says the court shall use gain, it's mandatory, if the gain results from the fraud. And the gain here does, in fact, result from the fraud. There's no way to get the preferred equity paid unless the indenture is modified. So there is that logical relationship between the two. And so it makes sense to use gain because the gain is the other side of the coin from the loss here. But on remand, there may be other ways to calculate loss, and that will be for the district court, I think, in the first instance. You just spent a lot of time telling us that it's extremely difficult to calculate loss. We think it's extremely difficult. I think gain works in this case. I'm not going to foreclose the possibility that there might be some other way to do loss if you can work through the beneficial ownership issues. I think what matters for purposes of remand is that the district court should not have used an event study in this case. That didn't make sense. And there's nothing in the law that says you have to use an event study in all securities fraud cases. Thank you very much. Good morning. Good morning. Good morning, Your Honors, and may it please the Court. Ron Sullivan here on behalf of Mark Nortlett. I'd like to start, if I may, in addressing the Court with respect to what's different today than with respect to the previous panel, which included Judge Loyer and Randisman, because many of the factual predicates that led to that decision are different. We now know that the government made misrepresentations with respect to the Francis memo. That is a material difference in this case. The Francis memo says Platinum intends to pay $60 million of the funds to redeem $60 million of the currently outstanding secured bondholder debt of $150 million, which leaves $90 million in bond debt in the hands of so-called friendly bondholders, most of which is held by Platinum itself. The Landisman Court did not have benefit of that. That was later discovered. Isn't that the problem? I've heard Mr. Axelrod say that in the context of the motions that are before us, a district court can't refer to trial evidence that was not before the jury in another case to determine the motion. Is that wrong? Yes, that's wrong because that would undermine any semblance of justice. The reason that that memo was excluded is because the government made the representation that the defendant hid the fact that there were no Platinum funds controlled by Mark Mortland. The government also made the representation that the Francis memo had nothing to do with Mark Mortland. That's just false. It is demonstrably false. And based on those representations, I was a trial lawyer. The court excluded that memo. Now that we know, and the government knew at the time, that Mark Mortland provided this very information to Mr. Hoffman, the CEO of Black Elk. It's in the 302s. Mr. Hoffman said, I didn't know anything about Platinum holding $90 million worth of bonds until Mark Mortland told me. Now the government tries to skirt around this. They told the district court, this has nothing to do with Mark Mortland. Wrong. We now know from the 302 that it had everything to do with Mark Mortland. The government says, well, really, the government changes its position. First it said it had nothing to do with Mark Mortland. We know that's not true. Then the government says, well, really, it's Hoffman that made the statement, not Mr. Mortland. And that cannot be a reasonable statement of the law I respectfully submit. If that were the case, I mean, I could imagine giving my students some hypos like the following. If that were the case, a carrier pigeon could grab a memo off of Mr. Mortland's desk and take it to Hoffman. If the government's argument that the carrier pigeon is the one who makes the statement, that's ludicrous. Would the government say that the guy in the biker shorts and visor who physically hands over the memo, is that the person? Who makes the statement? That can't be the case. So can you point us to a decision where we have, in the context of a Rule 29 motion in particular today, permitted a district court to refer to trial evidence in a subsequent trial, another case, to assess the sufficiency of the evidence or the, I guess, whatever, in connection with the case before it? So I'm not aware of a case like that. I'll supplement the record with one. I don't know one off the top of my head, but here's what I do know. You say you'll supplement the record. Are you going to send us a letter? I'll send you a letter if there's a chance. You've got a lot of paper. But there is a standard, Your Honor, out there, and it's in the interest of justice. And it is in the interest of justice if the government can cause the exclusion of a document based on information that it knows that's not true. Mr. Norlick had nothing to do with the letter. Was there a motion based on prosecutorial misconduct or the failure to produce braiding? Not at the first trial because we didn't know. But as soon as you found out, was there a motion along those lines? There was no motion along those lines. We took it up on appeal. Because what you're describing is usually framed in the context of prosecutorial misconduct or a braiding violation, but that's not what's before us. What's before us is an argument that is rooted in Rule 29. It is, and that's in the interest of justice. And it is what, or it is why, I should say, the district court said that the government's prior representation to this court, I'm quoting, that any information in the memo came not from Platinum, the defendants or other co-conspirators, was, district court's words, was certainly misleading if not outright false. We now know this information came from Nortlick v. Hoffman. Well, at the time of the misrepresentation, Mr. Nortlick must have certainly known it was wrong, didn't he? Yes. Well, then, I mean, we should. Well, that wasn't the appropriate time then to kind of sort it out as to the nature of the misrepresentation? No proof at that point. Mr. Nortlick's. No proof at that point. He knew of the misrepresentation, right? Absolutely. Where was Mr. Hoffman? Was he available? Mr. Hoffman was available. However, however. What a simple thing. This is so much after the fact. It's very hard to, it's very hard to, there are no less than four Rule 29 motions made by your client. I mean, this case has been, this case has had a very long journey, part of it, and Judge Boyet has been a part of the whole, almost the whole journey. But it's very hard to sort all these things out. But this is in the context of newly discovered evidence, right? It is. And it's because Hoffman. You just told me that Nortlick knew it. Nortlick knew it the minute that it was said in the first trial, Nortlick knew it. Explain to me how it's newly discovered in Nortlick. If that were the state of the law, every client I have would say that's false, therefore, I have a right to file. You need some sort of extrinsic evidence. It's important, as you quote Judge Kogan, wouldn't you think that Nortlick would have said, gee, that's a lie? Absolutely. That and a quarter would get me a cup of coffee. That's not enough. We only learned once the corporate, other corporate, Beachwood corporate defendants testified. This motion was made three years after the verdict, right? More than three years after the verdict. Three years after the verdict and, Your Honor, and. Outside the 14 days. And, Your Honor, importantly, after the Beachwood defendants finally testified in court. Remember, they took the Fifth Amendment, so we couldn't compel them. Well, your position is they threatened to take the amendment. You didn't subpoena them. You didn't bring them into the courtroom and force them to testify. You knew full well what this information was. And we've said previously, and Owen in other cases, the fact that it's available doesn't, the fact that it's now available doesn't mean it's newly discovered. In this context, we submit that it is newly discovered because we didn't have access to those witnesses. They wouldn't talk to us. The government had the information that Hoffman's 302. They didn't come forward and say that, hey, we've got this 302 here that underlines the representation that we made in court. Those witnesses would not talk to us. So the rule is if a witness doesn't talk to you, and even though they're subpoenaed, able to be subpoenaed, later on when they change their mind, that's the grounds for newly discovered evidence. That's the rule you want in the Second Circuit. The rule I want the Second Circuit, respectfully, Your Honor, the rule I want the Second Circuit to adopt is that the government cannot conceal information material to what the district court has decided. Yes, the government had the information, Your Honor. They have the 302s. My time has expired. I'll say more on rebuttal. But on rebuttal, I certainly want to address the affiliate issue on rebuttal because I think that's an issue sufficient for the court to decide in Mr. Norton's favor. So that would include the simonelli issues and so on? Absolutely. And yes, yes, the simonelli issue. And I can briefly say, since the court asked, if I'm permitted. In terms of simonelli and cassassis, this is how I see it, right? What the circuit court has done, and certain courts around the country have done, is attempt to figure out where the line is between a civil case and criminal liability. And here, in order to make some sort of distinction between conduct that is found in civil law versus the criminal law, the courts have required a scienter. And we have to get down to this issue of scienter in this case, that there was an intent, an intent to do wrong in this case, an intent to engage in an illegal act. Otherwise, everything else falls on the civil side of the line. Mere mistake. So Mr. Axelrod, I think, in the briefing, argues that there was adequate evidence of an intent to harm by stripping the bondholders of a contractual right, actually of different forms of a contractual right, and that that is sufficient to prove, as part of a scheme of the fraud, that's sufficient to show harm. And we respectfully disagree with that position. But what the record shows is that Mr. Nordlich intended for the bondholders to tender, and they got par plus accrued back. He disclosed to the CEO of Black Elk that Friendly's voted. One in five, one in five, one in five voted to that. Of the remainder, if you take, if you do the math and you take the Beachwood people out, and you have like 51 million, I think, shareholders left, or bondholders left, then 11 million voted to consent. And it's not clear whether all 11 million tendered or whether they consented and decided to hold on. One in five voted to it. But curiously, a 20% vote of people that agreed to the alteration of it became more than 50%, because a party that had a conflicted interest, because they were controlled by the obligor, which is the hedge fund, the Platinum Hedge Fund, which owned 85% of the stock of Black Elk, wiped out their secure position. That doesn't, that sounds to me like, that sounds to me like A, harm, or B, perhaps a scheme to defraud. The premise that there was a conflicted interest is belied by the fact that there was the proper disclosure. This is a case about an indenture. In your view, should a Beachwood have voted? That was up, my view is that that was up to the trustees. And it was unclear, no, I'm serious, your Honor. I ask you, you tell me, as a lawyer, because this mimics a law within the securities industry, a rule within the securities industry, were these people affiliates or not? They were not affiliates, absolutely not. That's your client's position. It is the fact. How do we know it's the fact? It is the fact because in the subsequent trial, nine months after your Honor sat on Lannisman, three executives came in and said Mr. Mortlake did not have managerial decision-making authority in Black Elk. Judge Colgan didn't have benefit of that in the initial trial, which is why Judge Colgan brought the government to the bench. This is extraordinary and said do you really want to go forward on this basis? I don't think that this case is what you thought it was. Now, when Judge Colgan denied the Rule 2933 and we're back here, Judge Colgan was attempting to assess what the Lannisman court said about how we value direct evidence versus circumstantial evidence. And Colgan said, Judge Colgan said essentially now as instructed by the Second Circuit, I understand them to say they have to take into account the circumstantial evidence. But what I think the district court heard is that prior, in the first trial, there was some ambiguous testimony about making decisional managerial decisions. That's what the indenture, that's how the indenture defines, that's how the indenture defines whether you're an affiliate. In the second case, and then there may, I will grant, there may have been some form of circumstantial evidence from which a reasonable fact finder could draw some conclusions. At the first trial. At the first trial. In the second trial, this issue was fleshed out in three witnesses. The president, the CEO, the general counsel came in and said Mark Morton could not make decisions. Now, whether he controlled some votes, that's not what the indenture said. And the government will agree that at Wilk, this is a contract case about the provisions of an indenture. Three witnesses said, so now you have direct evidence, specific, particularized, direct evidence, that Mr. Morton did not have decision-making ability. Only two people, Fuhrer and Taylor. That testimony was unrefuted. It was clear. It was unrebutted. And the government will agree that if there is no, if Beckett was not an affiliate, there was no crime here. And thank you for the couple minutes extra time. We got the floor to open. Good morning. Good morning. I represent Dan Small. Dan Small was not a party to the Landesman case. He was not a party on appeal. His case wasn't even discussed much at the Landesman trial because he was not a party there. So the Landesman rulings and the fact that Dan Small was not convicted of the wire fraud, the money or property case, makes his appeal completely different than Mr. Norlick's appeal. And I want to focus on the zero evidence that Mr. Small understood the affiliate rule. He knew there was an affiliate rule. He doesn't deny that. But he didn't know which affiliates, or affiliates and affiliates, as he calls them, were affiliates for the purpose of this complex voting information scheme. Nobody, there is no evidence that anybody gave Mr. Small the affiliate definition. The only one in the record is in the indenture. And that is clear as mud. Nobody, well, it says that there is affiliates and control, and those who have 10 percent of the voting of these shares are affiliates. So that's clear, and he knew that. And his conduct was consistent with that belief because he continually told Shearer's firm that the 18 million owned by PPVA, which held 85 percent of the voting shares of Black Elk, was indeed an affiliate. And anything else was something else, but not that. Shearer, who was the attorney supposedly leading the transaction and supposedly advising the client, did not understand the rule. And himself. And I think the record in our brief, Mr. Small's brief, shows that repeatedly. Shearer told Mr. Small to have all of the Platinum shares consent. And because he wanted to be able to show that the Platinum share, the indenture amendment would pass with and without the Platinum shares. Now, how is the lawyer supposedly advising on the affiliate rule say that? Because the affiliate rule said that shares are not supposed to be deemed outstanding for the purpose of this vote. So Mr. Small advised him. I say advised because Mr. Small never met Shearer. Shearer never met Small. And the only time they really interacted was when, at the end, Shearer asked him, what is this? And decided that, well, they're different, and he would not count those shares. But in fact, Shearer counted those shares. Our reply brief in our brief shows that in hot verba, I suppose. With the exhibits and what Shearer said, what Shearer said he was going to do, and what he didn't do. At one point, the exhibit that the government points to, to suggest that Mr. Small knew, Mr. Small is asking Attorney Sackowitz for information about how the indenture, the affiliate rule, would operate. So let's say if this 18 million shares are excluded, then you need whatever it is, percentage of the remaining shares. And Sackowitz said, that's right. She didn't say, and Shearer didn't say, well, now you have to know which affiliates are in fact excluded. There's no evidence that anybody explained to Mr. Small what the affiliate rule meant. And it wasn't, what the government does instead of that is to say, well, he should have asked. He should have found out more. That puts the burden of proof on the wrong party. Mr. Small, the evidence showed, the government's evidence showed. There was no conscious avoidance. Nobody ever suggests a conscious avoidance, and there's no evidence of conscious avoidance. Mr. Small was a businessman who was working for Nordlicht, and whose job was to just put together the transaction, which was a business transaction to him. It was a business transaction to try to reduce Black Elk's load, to be able to have it continue into the future, and be a vote counter. And he counted votes. He didn't know what the affiliate rule meant, and nobody told him so. Now, the government says, and Judge Kogan ended up saying, well, that he should have asked, and the fact that he didn't ask means he didn't want to know. But that is, with all due respect, somewhat crazy. Because if he didn't ask, it shows he didn't know the information to ask, and there's no evidence in the record to show that anybody told him that the affiliate rule, what it actually meant. And, by the way, what it actually means is, unless you've been in this job for decades, reading Second Circuit opinions, as I have, the whole theory of control person liability is not something that an average businessman knows. It's something that a lawyer might know from reading Second Circuit and other opinions. So the only reason that the control person, the factual thing came up, is because Scherer later said it would be a fact-circumstance test, which it is. But Mr. Small wasn't told that. He wasn't told what controlled person liability is. He just was told that this is what you have to do, and here's the indenture. There was no exclamation of it. The government says that Small should have asked Scherer. What is in your view, was there an argument about what the ordinary meaning of affiliate is? Yes. An affiliate, it was defined as control, or 10% control. And he, or Povino, got them confused. One of them said on the stand that his view of that was that it would exclude an affiliate that controlled 10% of the voting shares. And that is what the normal person thinks. That is what Dan Small thought. The SEC has no explanation for affiliate, that it applies automatically or exclusively. So it's facts and circumstances then. For sure, when it comes to Beachwood, the inference that Dan Small knew that Nordlund controlled Beachwood, if he did, if Nordlund controlled Beachwood, is absolutely non-existent. We discussed this in our brief. So he emails the Platinum Trader asking to identify and tabulate recent Beachwood purchases of Black Elk bonds. Correct? He's conducting a bond indenture voting transaction, so that's what he's identifying. Does that show he knows anything more about control person or control issues? It does not. It's specious. It's speculation. It's an inference on inference. The fact that Judge Kogan highlighted, as I think Your Honor just did, Judge Lowy, that Mr. Small was not in the dark about this because he knew that Mr. Nordlund, who was his boss, sat at the desk or had lunch or whatever he did. But that isn't showing control. That's showing there was a relationship, which wasn't hidden. The jury could not reasonably infer, and reasonably, through rational inferences based on evidence, that Mr. Nordlund controlled, if he did. Judge Kogan said that a jury could reasonably infer that Small knew Nordlund, his boss, maintained an office at Beachwood. So, you know, that doesn't apply to control of the business for the purposes of the... It makes him available to know things, doesn't it? It might. And then... Could a reasonable inference be that Mr. Small then was familiar with Mr. Norlund's relationship with Beachwood, not understanding the characterization by Beachwood's officers? No, it doesn't yield that inference at all. It yields the inference that they were related. I mean, and Mr. Nordlund did say and deal with Beachwood. I know Levy came over, but did Small spend any time actually working at Beachwood? No. None in the least. And nobody... Which differentiates him from Levy, right? I'm sorry? Which differentiates him from Levy. Totally. The evidence about Levy that's brought up in the Landisland opinion has zero, and I'm saying zero, zero to do with Mr. Small. He was not involved in that aspect of the case. But was there evidence that he understood or knew, actually, that Mr. Nordlund was frequently, along with other platinum employees, was frequently at Beachwood?  Frequently? No. Okay. No, there wasn't. I urge you to differentiate him because he was not Levy, he was not Mr. Nordlund, he was not... He was a guy... Oh, I know that. Well, I apologize. I exaggerate there. The argument is, what did he know? What did he... What did he know? What did he know? I think he knew, but you are saying that I'm wrong, that Mr. Nordlund, for example, used the offices, that there were a number of employees from platinum... No. ...at Beachwood. No. And you're denying all that. No evidence in the record of that. Zero evidence in the record. Thank you. Is there anything else? I will await rebuttal. We've got some rebuttal. Okay. Thank you. We're not done yet. Yes, and, Your Honor, if it's acceptable to the Court, I'm going to start with Mr. Small's issue.  I'll address Mr. Nordlund and then there are a couple of things... I already want to proceed. Excellent. So, there was sufficient evidence that Small was aware that Nordlund controlled Beachwood. To begin, Small proposed himself as a Beachwood portfolio manager. That's in the record at Government Appendix 530. Judge Loyer, to your question earlier, Small asked whether Nordlund wanted him to set up meetings at Beachwood or Platinum. That's in the record. That's at Government Appendix 534 and 535. A significant number of Small's colleagues at Platinum were working double time at Beachwood, including his office mate, David Levy, who was also the co-manager of the Black Ops position and who became Beachwood's chief investment officer. But it wasn't just David Levy. It was also Natali Manella. It was Paul Poteet. It was Will Florida. And on top of all of that evidence, that he knew the relationship between the funds, he knew that Nordlund had an office there, he had a Beachwood email, he proposed himself as a portfolio manager on a Beachwood deal, he attended Beachwood calls, his office mate was there. On top of all of that, he had access to Beachwood's internal positions. That's confidential data. He knew how many bonds Beachwood had bought. He knew that Nordlund had crossed them. And most importantly, he knew how Beachwood would vote. Because in his tally of how the bonds will vote, in his tally of which bonds he tracks, the total amount never changes. It's always $98 million. And the bonds move across houses. But the amount that Small tracks is always $98 million. And the amount that Small understood would vote in favor of the consent but not tender is $80 million. And that's in the record as well at Nordlund's appendix 1336. In addition to that, of course, the jury had to find that Nordlund, in fact, controlled Beachwood. And I think the evidence was substantially similar to the Landsman evidence on that point. So I won't address it. But that was the evidence from which the jury concluded that Small knew that Nordlund controlled Beachwood. And there was other evidence as well, which goes to whether Small was confused, from which the jury could infer knowledge. There was evidence of Small's motive, and there was evidence of his criminal intent. The motive was that Nordlund told him that if they didn't pay the preferred, it would be the end of the fund. And that was what Nordlund was spending his time on. That's his boss. He was trying to help his boss. His intent. There were two pieces of critical intent evidence in this case. The first is the juxtaposition between what Dan Small knows in July, what he's doing behind the scenes, and what he tells Rob Shearer, the Baker Hostetler lawyer. And this is what the district court was citing. The district court wasn't citing this for knowledge. The district court was citing this as consciousness of guilt. Small, in the district court's words, was fastidiously tracking the bonds as they moved across houses. Total amount never changes. How they're going to vote doesn't change. But he's tracking them. And at the same time, he's having discussions with Shearer about which bonds will be disclosed, about how the affiliate rule affects the calculus of consent. At the same time, he's doing both of these things. And he never mentions the PPCO, the PPLO, and the Beachwood bonds to Shearer. He never asks, even though Shearer said an affiliate is common control. There was more evidence. The jury saw when Dan Small ultimately disclosed the PPCO and PPLO bonds. He disclosed them in August. After he did the math and he saw that the consent solicitation passed, he sent Shearer a fraudulent officer certificate, and he disclosed the PPCO and PPLO bonds, which were no longer necessary to secure the results, as, quote, possible AFL, possible affiliates. Shearer testified that Dan Small never told him what funds held those bonds. There's a reason for that. Those two funds are Platinum Partners Liquid Opportunities and Platinum Partners Credit Opportunities. He didn't tell them the name because their affiliate status is obvious from the name, and yet he had hidden them from him. It's not just that Dan Small didn't ask about Beachwood. He never- He provided other names? No, Your Honor. He didn't provide any names. He hides PPCO and PPLO as possible AFL, even though he had told Nordlich that they were deemed not affiliates. And, Your Honor, this is in the record at Nordlich's index 1342 and 1344. He sends a chart. They see that the consent solicitation has passed, and Shearer is hounding them for an officer certificate. And so Small sends a chart to Nordlich with three scenarios, showing that the consent solicitation will pass even if they now disclose the PPCO and PPLO bonds. They can't disclose the Beachwood bonds. It is only then that he provides additional information to Shearer. But he doesn't tell him about the Beachwood bonds, and he never gives him the names of the funds that hold the PPCO and PPLO bonds because it's suspicious. And to the point of Shearer told him to vote the bonds, he had already voted the bonds. And he never told Shearer, oh, well, thanks for that advice. I actually voted these bonds that are in two funds that have platinum partners in the name. So the actual evidence before the jury was very different. The evidence before the jury was that Dan Small was a trained attorney. The evidence was that he asked about the functioning of the affiliate rule and the definition of an affiliate, and he was sent a definition that contained control. There was no mention of the 10 percent in that email. And when he responded to Shearer twice, he referred to control. He said bonds controlled by platinum or PPVA. He didn't say bonds owned by PPVA in those two emails. On top of that, you had this evidence of intent. And so that was fair evidence for the jury to conclude that Small didn't make a mistake. And the jury was actually specifically charged on this. The jury was required to find, beyond a reasonable doubt, that Small understood that these were affiliates. I'm running out of time, so I would like to... Yes. John Hoffman... No, thank you, Your Honor. I would, but hopefully it won't take me too long. John Hoffman and Mark Foyer were both on the defense witness list before trial. The defendants had 302s from both Hoffman and Foyer. There is no universe in which this evidence is newly discovered. And just roughly to your point, they didn't try to call any of them. And the reason they didn't call Hoffman is because Hoffman's testimony would have been bad for the defendants. Because while Mark Nordlich didn't give him the details, the information that Nordlich gave to Hoffman was sufficient for Hoffman to become so concerned that he sought legal advice from Baker Hostetler on whether to participate in it and whether he should sue Platinum. The Hoffman 302 is not helpful to the defendants. The Hoffman 302 confirms the government's theory that the plan was to strip the assets out of Black Elk and leave it for dead. And that's what the Francis Memo says, too. The Francis Memo doesn't address affiliate status. It doesn't address Beachwood, PPCO, or PPLO. But what it does say is that Platinum plans to leave Black Elk to, quote, die on the vine. And that was the government's theory. I'm running out of time, so I would like to... Briefly, one question. Your opponent makes largely testimony of the three individuals at Beachwood and that Nordlich really wasn't the guy running the show. It seems to me that presents a potential legal issue, and Ms. Shevitz made a reference to the affiliate rule that there's a legal issue lurking here. What constitutes control? Is it purely defined by legal status or is it defined by fact as to how it's done? And wouldn't that have been better served by clearing that issue in front of the court? I mean, I could envision that the parties would have an argument and then there would ultimately be an instruction as to what constitutes control, whether Beachwood gets counted or not gets counted. Yes, Your Honor, there was actually an instruction in Small's trial about the definition of control. What about Nordlich? Was it requested? That's number one. Was the issue before then in Nordlich's trial? Your Honor, I am not sure. The definition of control in the Small jury instructions reflects the definition of control that is in the indenture, which is the power to direct or cause the direction of the management or policies of such a person. So it's actually not the case that the jury instructions left the jury to figure out what control means. There was additional gloss that was provided. Of course, Small was tried after Lansing, wasn't he? He was, Your Honor. So he had the benefit of seeing this court's view with regard to the sufficiency of the evidence with regard to what Nordlich and Levy are, right? That's right, Your Honor, and the evidence that Mark Nordlich, which was similar, controlled Beachwood is, in fact, overwhelming. Mark Nordlich founded Beachwood. No, I understand that, but it seems to me that it might be a legal issue. My question really was, was that legal issue identified and or employed as part of the defense case in front of the Nordlich jury or in the Nordlich case? I suspect it was not. Your Honor, I am candidly not sure. I know this came up at the Small trial. If you would like, we can check and address that issue. I'm not sure Mr. Sullivan is going to tell us something, but if we do, I'll ask the senator to show us that permission. The last thing I'd like to address is Mr. Sullivan's suggestion that courts across the country, circuits across the country, are using money or property to define a difference between civil and criminal cases. The decisional law on money or property struggles with two areas, and you've seen the Supreme Court do this. It struggles with when information is property. That's cases like Carpenter itself. That's cases like Timonelli. Cascade, this court's more recent decision. And then there's another set of cases that deal with government as victims and regulatory rights. And going back to Cleveland, Your Honor, and Pasquitino, which recognized that a right to be repaid held by a government is property. All of those cases, that's where the trouble is. This case does not deal with information. This case deals with what made these bonds senior and secured. Those are straightforward contract rights. We're dealing with collateral and repayment. That's not information. Those are valuable bargain for parts of the bond that relate to the interest rate that you pay, that relate to economic risk. It's not information. And the cases where the Supreme Court and this court have drawn a line all deal either with true information, where the government is saying that commercial information is property, or this difficult issue of when the government is enforcing a regulatory right, a license, as opposed to a commercial right. None of that comes up in this case. Thank you, Your Honor. I just have four very brief points. First on losses. These were, and this is clear from the record, that these were publicly traded bonds, and at the trial level there was an unrebutted expert report that there were no losses. Judge Kogan so found. The government had an opportunity to call an expert or to solicit an expert opinion. It did not. That finding should stand, and there's no ground or cause here to disturb that judgment and subject Mr. Norlick to re-sit and sit. I think Mr. Axelrod was providing us with the procedural roadmap. Should we agree with him on the Rule 29 issue and send it back, then what he's saying is that it would be subject to de novo resentencing, and presumably we wouldn't have to deal with any of that. You would agree with that? Correct. We wouldn't have to say anything one way or the other. Correct. I think the procedural path is problematic. I presume it would lead to the same result, given what the record is, that there were no losses. But you're right. As a pure matter of procedure, the court is right. The second point, very briefly, is that I would urge the court not to conflate a sort of lay definition of controlled with the definition in the indenture of affiliate. The definition of affiliate means that Mr. Norlick would have been able to make managerial decisions. He was not. We know that as a matter of fact. Three executives said it. No witness has said that it's not true. Third, I would just point out in our colloquy, Your Honor, Mr. Norlick is not charged with a criminal conflict of interest. He's charged with making material misrepresentations. I appreciate that. The question is, I just don't understand. I mean, it seems to me it's central in understanding the affiliate rule. It may become more well-defined in Small's trial as opposed to your trial, your client's trial, because of small voice, small structures of defense. To be honest with you, what's troubled me in Judge's case is, why wasn't this routine to me that one of the things Norlick would be saying is, I didn't control Beachwood. Control is a matter of contract law. I would have thought that it's easy for me to say this. In hindsight, it's always 20-20. But it would have been very easy to say to the judge, Judge, the government's theory here is completely wrong. He had no contractual control over Beachwood. He might have had moral suasion over Beachwood, but that's not enough under the law.  We certainly made those arguments. Well, but you didn't make the argument here. Well, yes. It's in our briefs. Did you make the argument here on the Rule 29 motion the first time out? Because that's where your submission to the argument is defined, correct? Correct. Absolutely, Your Honor. I'll look back to see if you made the argument. Very well. I'm not blaming anybody. I'm just trying to sort through what an extraordinarily complex, you know, problem because of the various motions. It's absolutely complex, and I did make those arguments below. My friend over there, I guess, argued better than I did at the trial court because the judge did not accept those arguments. But I thought and think we are right, and in Mr. Small's trial, we see the three. And the last thing, if I might just impose on the court for ten more seconds, I would just say that, you know, this question of procedural default has to be weighed against the standard of manifest injustice, which the district court initially found, and we respectfully submit that it would be manifest injustice if this conviction is allowed to stand, in that it has now become clear that Mr. Nordlich made a full disclosure to Mr. Hoffman, the maker of the statement, and that that full disclosure means that there's no crime here. The governor says Mr. Hoffman is not on your witness list. Is that true? He was on our witness list, but he wouldn't talk to us, and his lawyer said that they would plead the case. So you had access to 302, the FBI? We had access to 302. We could not get that information in evidence because of hearsay. So it's not newly discovered? It is. I would say that. I'll tell you, it's not newly discovered. I will say this. For purposes of this very complicated labyrinth on appeal, we're going to submit that it is newly discovered, and I leave it to the court's discretion. Thank you very much. Thank you.  Everything that the government argues about what Mr. Small knew, does this get raised up again? Got it. Leads to speculation. There's no rational inference that Mr. Small knew, understood, if Mr. Nordler controlled Beachwood, that he did. He set up a meeting, so? So he set up a meeting. Levy, his co-defendant and co-employee, was there at Beachwood. So the inference from that, it's not a clear, rational inference that, therefore, if Mr. Levy knew that Nordler controlled Beachwood, if he did, that Mr. Small would have known. Mr. Small was an employee, and he was an employee whose job was to manage this transaction about the indenture. All of this is speculation. Shearer, moreover, did not himself understand what was happening here. So the government, and Your Honor, suggested because Mr. Shearer said or did something or had something to do with the transaction, that, therefore, Mr. Small should have asked him more. But Mr. Shearer didn't know. Mr. Shearer, frankly, committed malpractice in how he advised or didn't advise the clients in this indenture amendment process. In the end, when Mr. Small was preparing the certificate and said that there was a different kind of could-be-deemed affiliate, well, in response to Mr. Shearer's questions, Small did indicate that there was a different group of bonds held by entities in which Platinum had relationships. This was quoted in Lansman, Lansman at 316 to 317. And that they could be considered affiliates, but he did not think they were affiliates like PTDA was. And that's that chart that says not deemed affiliates. So that suggests that he has some understanding of what an affiliate means within the meaning of the indenture provision. That suggests that... I thought you were arguing earlier that it was not clear to him what an affiliate is. No, it was clear to him that an affiliate meant 10% equity control, which is what he, the investor, thought and testified to as well. And it apparently is what Shearer thought at the beginning because Shearer didn't say anything. Shearer, the lawyer, about these other... Either way, Shearer and his firm had represented Black Elk previously and understood or knew and were given information about who held what bonds. And Shearer didn't ask any questions. The burden of proof is on the wrong party here. Shearer should have asked questions, and when Shearer is told... Is Mr. Small not a lawyer? He went to law school. He has not practiced law. He's not a securities lawyer. He's not working as a lawyer. He worked as an employee of Platinum and was assigned to this transaction. No. So, no, he hasn't read the Second Circuit opinions on control persons. That was your point. But he went to law school. He's got a license. He went to law school.  And more than that, I don't know because that wasn't part of his... What are you saying over here? Okay. Now, Your Honor mentioned, Judge Wesley, that the Rule 29 motion sets up the sufficiency analysis. Our appendix, addendum to Mr. Small's brief, is Judge Kogan's decision denying Mr. Small's Rule 29 and Rule 33 motion. It's clear from that. In one part, Judge Kogan says, why should Mr. Small be held to a higher standard than he and Shearer? Which is a good question. But it's also clear that Judge Kogan had reasonable doubt about this case, more than reasonable doubt, and wanted to grant the Rule 29, Rule 33 motion, but was gun-shy, frankly, because of Landisman. Because on his previous grant... Sometimes our opinions have that effect. Exactly. When they shouldn't. I was a trial judge once. I remember being reversed. There you are. So, Judge Kogan remembered that only too well, and if you read his decision, and read all the inferences he has to draw, turning himself like a pretzel to sustain the verdict. It's unfair, unjust, and unsupported here. We ask you to reverse Judge Dan Small's convictions. Thank you very much. Thank you all. Obviously, it was a rare decision. Very much appreciated your time.